We'll move now to Appeal 23-1020 U.S. v. Han. Mr. Brindley, we'll begin with oral argument from you. May it please the Court. My name is Beau Brindley, and I represent the defendant appellant Huazhi Han. When law enforcement officers approached the door of the home of Huazhi Han's house, they told his wife, Mr. Han has already consented for us to come in and search. They told his wife that there were firearms in the home that they believed posed a very serious danger to the infant child. Now, after an evidentiary hearing before the District Court, the District Court found that there was no consent from Mr. Han, despite the agents who testified that there was. And she gave detailed reasons for agreeing with us. So what that means is that law enforcement officers went to this woman and they told a lie. And they told a lie for one reason. The critical question in this appeal isn't that they misrepresented something. They can do that in certain contexts. But it's the reason, the only reason for this particular misrepresentation. This is a fraud on Mrs. Han that can only be used for one reason, and that is to get into a home when they did not have the authority to go in. There is nothing in the government's argument, anywhere, that suggests any other purpose. You tell a person, we've got the authority to come in from your husband. Why? Because they want to get in and they didn't have the authority. Through the entire evidentiary hearing, evidence came out that Mr. Han, he had firearms, sure. But there was never any evidence that anybody thought that these firearms were somehow in a position where they posed a serious danger to an infant child. Yet, law enforcement officers told that to Mrs. Han. Again, the question is why? Why? Because they wanted to get in the house. And they didn't have a warrant to do it. And they didn't want to wait. And so what we have here is a situation where law enforcement is using a fraud or a false statement, a lie, however we characterize it, for the purpose of impacting a person in the home's decision to consent. Mr. Brinley, does the record show how long Mr. Han had been in custody when the officers approached Ms. Wang at her front door? I can't tell you the exact amount of time, Your Honor, but it was not immediate. I mean, he'd been in custody for a little while. He was detained at another location for a while, and then he was taken to a police facility somewhere. And all of that happened before the agents were on Mrs. Han's doorstep. Because they were telling her at some point, they were telling her that he was at the facility with the officers. So a period of time had passed. It wasn't instantaneous. We can tell from the video that it's daytime. Yes. When they're interacting with her. Do we know the time of day that they were talking? The problem is, the only video that we had coming from Mr. Han's cameras, the timing was off. We can't say that those times are accurate. The video is there, but the timing is off. So there's no way that I can say with specific accuracy what time they were there versus what time he was arrested. And we can't rely completely on the agents, because of the findings of the district court, say that when the agents are talking about what was going on with Mr. Han, their testimony was not believed by the district court. So in terms of the timing, I don't know the specific amount of time, or I can't say with certainty. However, I can say that it was not instantaneous. They got him and they went to her at the same time. That happens sometimes, but it didn't happen in this case. You raised credibility, and that's important because there's at least two portions of the videos where this alleged consent could have occurred. And the district judge made her determination that consent did happen here as a result of her credibility call of those officers. It's at the same evidence you're hearing that she's saying, no, the officers are not credible with regard to Mr. Han giving consent, that she's saying the officers are credible with regard to Ms. Wang giving consent. Is that true? I think that's what the district court said. I think the problem with that is in part that I don't think it matters how truthful they were about what they said to Mrs. Han. After they told her that they already had the authority to come in. That impacts her decision-making. That impacts any one of our decision-making. If they come to my house and they say, my wife gave us consent to come in, and I believe them, well, there's not a lot I can do about that to some extent. Even knowing the law, there's not. That's going to give them some reason to come in. And this person who doesn't have any training in the law is told that. It impacts her decision to consent. So no matter how good they were after that, it is my position that it should never be countenanced when the lie told is told to impact the consent to enter. That is what happened here. And we've cited some of these cases in our brief. The Griffin case saying that subtle coercion such as an assertion of authority can change what appears to be voluntary to involuntary. Bumper v. North Carolina says authority to search when they communicate to the person they basically have no right to resist is no authority at all. Well, she was a college-educated woman, right, Mr. Brumley? Yes, but I don't think that gets you around. She is, I agree with you. But that does not get you around law enforcement. Your husband said we have the authority to come in. Would you believe that? Well, she might have said, well, I'll check with my husband. But she couldn't say that. And she knew she couldn't say that because they said he was locked up someplace else. So she couldn't. They took away any opportunity for her to verify their position. But I think there's something particularly insidious about this kind of a fraud that's used by law enforcement. They basically were allowed to lie about what happened with Mr. Hahn, make up a consent that they didn't get and couldn't prove, and then have it countenanced as not mattering because after the fact they had spoken to her. Now, the district court also found that when they were showing her the form on the video that was available, there was no apparent explanation of the form to her before she signed it. Mrs. Hahn did testify and said she didn't feel that she was in a position to refuse. And the district court never found or made any kind of negative credibility finding about Mrs. Hahn. That didn't happen. The difference between the evaluation of Mrs. Hahn and the evaluation of the agents, on the agents' side, they gave affirmative testimony the district court didn't believe. On Mrs. Hahn's side, the district court, in the one place where she thought there was a difference, Mrs. Hahn thought that she heard them say bombs and not guns. The district court thought that that was a mistake perhaps on Mrs. Hahn's part and pointed that out. She didn't suggest Mrs. Hahn was lacking credibility at all. And so when you combine all of it together, another case that we brought to your Honor's attention was Groves where there was a statement, any level of threat or coercion related to one's child would weigh against the finding of voluntariness. And I think it's important to put the two things next to each other. Your husband said it's okay for us to come in. We've got consent. Not true. That's going to impact her thinking on consent. There are guns. Let's give them the benefit of the doubt that it's guns. That's what the district court found. There are guns in the house. We believe there's a serious danger to the infant. We need to come in. That's going to impact her consent. But that wasn't true either. There wasn't a shred of proof that any agent actually was worried about the guns in an infant. There was not anything in the report from the interaction with Mr. Hahn that suggested some statement that was made there, suggested the guns were somehow positioned so an infant would be in danger. But you bring up the child for one reason, because you think it's going to make her let you in. Ian, though. So, Mr. Brindley, the sequence controlling for the variable that there's various ring cameras, and the ring cameras may be on different timelines. It looks like the officers are there for about an hour and a half. Initially, there's the statement, he told us we could look. Then there's a gap. It's unclear whether or not there was consent at that point. Then there's the statement about the baby and the guns. Then there's the second gap, and I think that's when Judge Wood concludes that there could have been consent, although the transcript's not completely clear. Then the ring camera videos go on for about the next, say, hour and 20 minutes, correct? Yes, that's correct, and I think that's critical, because the point at which Judge Wood found that the consent must have happened was a point after both of those things have taken place. When I say both of those things, your husband told us we can come in. We made that up. That's false, but that's what they tell her. We're worried about danger to your child. Then they get to come in, and there are not that many situations. Let me say it this way. There are many situations, oftentimes in interrogations and such, where law enforcement is allowed and do misrepresent facts, make you believe, well, we got this guy in here, and he already told us, even though it's not true, to try to see what the person will say, but they only do that after they've followed the proper rules to waive that person's right and follow the Constitution. The difference here is that this is a fraud and a lie that is told, in fact two in my estimation, that are told to overcome the first step, which is getting around the constitutional right. When that is the nature of the false statement, I think suppression must follow no matter how. Counselor, are you asking for a bright-line rule? We're not going to totality the evidence. If there's one statement that's deemed false, there's suppression. Well, I guess I think there are certain… Volunteering is totality of the circumstances. Certainly you can consider the totality of the circumstances in every instance, as you've already always said that you would, but I would suggest this, and I don't think this is an outrageous assertion. When there is a lie told, and it's not that many fines that a district court finds against agents like this, there are good reasons to do it, but when that happens and there's a lie told by agents for the purpose of affecting consent to enter a home, then yes, I think that that lie is sufficient to overhaul whatever other facts happen afterwards. If there was something else perhaps that happened before, I think it would be more relevant, but there's not. They start with the lie. Your husband said we can come in. And how is that not going to do terrible damage to the Fourth Amendment if police officers are allowed to circumvent the Constitution by claiming an authority they know they don't have for the sheer purpose of getting into a place that they have no right to go rather than follow the rules? That's what they did. And no matter how nice they were to Mrs. Hahn afterwards, no matter what they said to her afterwards, nothing in the district court's opinion can change the fact that we sit here today and there's none of us that can say, didn't that have some impact on the consent that happens before they walk in that door? Yes, it had to. There is no way in the evidence of the totality of the circumstances to suggest that it did not. Did you reserve the remainder of your time? Yes, Judge, and with that I will reserve the remainder of my time. Thank you. Thank you, Mr. Brindley. Ms. Alexakis, let's hear from you. Good morning. May it please the Court. Georgia Alexakis representing the United States. The district court here properly denied the defendant's suppression motion. It did so based on extensive factual findings and credibility determinations that were supported by the record. In particular, a record developed over the course of a two-day evidentiary hearing in which the district court reviewed the surveillance system recordings that the defendant proffered in support of his motion and during which the district court heard live testimony from officers and Ms. Wang. And I want to correct a couple of misstatements from defense counsel. The district court was quite clear that it was not making an adverse credibility determination against the officers. And I would point the court to Record 164 in which the district court makes that quite clear. I would also take issue with the defendant's representation that the district court did not make an adverse credibility determination against Ms. Wang. Appendix 33, which is the last page of the district court's opinion, denying the defendant's suppression motion, the district court specifically states that it did not find that Ms. Wang convincingly testified that she only consented to the search of the home because of the officer's actions. And instead what the district court did is it looked generally to the totality of the circumstances and accounted for the officer's actions. In particular, the statement that Mr. Han had provided consent to search the home, as well as the officer's representation that there were guns inside the home and that guns logically are dangerous and that guns logically are even more dangerous in a home with small children. The district court defendant repeatedly refers to the officer's statements as a lie and a fraud. And again, I think that's a misrepresentation of the record. The district court consistently found, again, not that the officers testified in an uncredible manner, but rather that based on the evidence in general that the government presented, the government failed to meet its burden of proof that Mr. Han had consented. And we see that this distinction between a lie versus a simple evidentiary issue, a failure to meet that burden of proof, we see that that distinction matters when you get to trial where the defendant argued to the jury during closing that he in fact did consent to the search of the home. And no, that doesn't change the district court's ruling with respect to the suppression motion that the government had failed to meet its burden by preponderance, but the government's view dramatically undercuts the defendant's argument on appeal that the officers had in fact engaged in a fraud. And in particular, I point the court to page 122 in the closing argument of the defendant. The date of the transcript is March 22, 2002. I'm sorry, I said 122. It's page 133, in which defense counsel affirmatively argues that Mr. Han consented to the search of the home and uses that to argue to the jury that that shows that Mr. Han lacked consciousness of guilt. And so what the district court considered as part of its totality of the circumstances test was a number of factors. Ms. Wang's age, her college education. She describes her as being, quote, not agitated or distressed, rather calm and controlled. There was no evidence of physical coercion. The lead officer here was a petite female. There were no threats. The guns were holstered. Ms. Wang was not in custody. And the district court goes on to point out how Ms. Wang influenced the scope and the timing of the seizures. She pushes back on the seizure of the Mercedes. She refers to it in the transcript from the suppression hearing, page 227. She refers to it as a private item and private property that the officers can't take. She wholesale prevents the seizure of her personal cash, and the district court observes that in its opinion. She dictates other terms when she pushes back, when the agent tells her to get the baby. She says, no, the baby is sleeping. And this is right after the agent tells Ms. Wang that there are guns in the home that could be very dangerous to the baby. Rather than that being some kind of manipulative, emotional appeal to Ms. Wang, again, it's a reasonable statement. Guns are dangerous. Guns in the presence of children are even more dangerous. And Ms. Wang's reaction to that piece of information was to push back against the agent and say, no, I'm not going to get my baby. I understand that you are indicating that this house is an unsafe environment, but my baby is sleeping, and I will leave the baby to sleep. And they went so far as to go with her to pick up their other child at school. Correct. And she dictated the terms of that pickup, Judge Brennan. She said that you can't take the Mercedes now because I need to go pick up my son. And when they explained to her that that was fine, that she could go pick up her son, but that agents would need to come with her given the circumstances, she said, okay, but agent, when you come into the car with me, you are going to follow, play along, and help me represent to my son that you're just a friend from college because I don't want him to be scared, which is a completely understandable reaction from Ms. Wang. But it also speaks to the lack of coercion going on in this interaction between Ms. Wang and the officers. Let's talk about the sequence here. Is it clear from the transcript as to which gap the district court concludes consent occurred? Because there's this one gap for it looks like about 23 seconds, 1634.18 to 1634.41. Then the second gap is from 1635 to 1636.52. Is it the first or second gap she says Ms. Wang consented? The district court found the consent happened during that second gap, during that two-minute gap. And she finds that based on Agent Prisbillo's testimony, and she effectively makes a negative inference against the defendant by pointing out that the videos would only have been in the defendant's custody. So if there was any suggestion that consent did not occur during that two-minute gap, it was because that gap exists after the video had been tendered to the government from the defendant. And to go back to another question you had asked Judge Brennan earlier, the record is clear that the search took place at around 3.30 in the afternoon. The district court found that. I think the officers testified at the suppression hearing that that was at least a couple of hours after they had arrested Mr. Han. And I think to me that speaks to another factor for purposes of the totality of the circumstances, which is that you don't have a situation here where the officers are arresting Mr. Han and then racing to his home immediately to search it. There's testimony at the suppression hearing. This is at 191 and 192 from Agent Caruso's, in which he testifies that they didn't actually think that they were going to find anything in the home. And so, again, that undercuts this argument that the agents showed up so dead set on getting into that home that they were going to get in regardless of what Ms. Wang said to them. And in fact, what they testified to and what the district court credited them as saying is that the officers asked if they could come in and they waited for that consent, thus signaling to Ms. Wang that she could withhold that consent and therefore putting the facts of this case much more on all fours with the McGraw case that the government cites in its response brief, and quite distinct from a number of the cases that the defendant cites, like Thumper, for example, in which it's clear from the facts of Thumper that the consenting individual only consented based on the representation that the law enforcement had a warrant. And so Bumper recognizes both this unique sort of force that comes along with a representation that one has a search warrant, that even a layperson would understand that a search warrant, a representation of the existence of a search warrant, would have more of an effect in terms of vitiating consent. And then you also had testimony in Bumper credited by the lower court in Bumper that the consenting individual only consented because of the representation. And so again, based on the totality of the circumstances, which the district court here did not air in its factual findings when it found that Ms. Wang freely and voluntarily gave consent to search the home and didn't do so as a result of some kind of claim of legal authority. Unless there are any other questions from the panel on this topic or any of the other issues that have been raised by the defendant, the government would ask that the district court's judgment be affirmed. Thank you, Ms. Alexakis. Mr. Brindley, we'll go back to you now. We'll give you two minutes for rebuttal. Thank you, Your Honor. To begin with, the government suggests that there was no explicit negative credibility finding against the officers, but the reality is two officers got on the witness stand and testified to a specific thing happening, and the judge gave a whole bunch of reasons for why she didn't believe it happened and then said the government didn't prove it. There's not much real estate between those two things. The evidence here is that what they said wasn't true. Mr. Hahn's lawyer arguing in closing that he consented because that's what they said in the reports. He probably got that out of the law enforcement officers at the time. That's a strategy thing. It has nothing to do with Mr. Hahn's position on this whatsoever. But then a lot of the focus in the district court on the voluntariness and in government's argument a moment ago was that there was no force and she was calm and they didn't seem like they were trying to intimidate her. That kind of thing. But if you believe the first statement about Mr. Hahn giving consent, there's not going to be any of those things. You're not going to see anybody under great pressure because they believe it's already done. The husband has already said you can come in. And if that's true, if they got in based on that statement and that necessarily impacted her decision to let them in, I don't think there's any way or any evidence that says Jess did not. If you have that, then them writing the consent inside with her afterwards doesn't make any difference because they're already illegally present inside and the whole thing would be tainted. So the question is can they do that? Can they say we have the authority to come in and then get in and then have it countenanced because they didn't do anything to intimidate the person in the process? We would say that the answer is no, and we would ask that the decision of the district court be reversed and the case remanded. Thank you, Mr. Brindley. Thank you, Ms. Alpsakis. The case was taken under advisement.